THOMAS F. McDONALD v. R. L. POLK & COMPANY, Appellant.—142 S. W. (2d) 635.

Division One, August 16, 1940.

616

*Williams, Nelson & English, Cullen, Storckman & Coil* and *Everett H. Wells* for appellant.

618

*Moser, Marsalek & Dearing* for respondent.

BRADLEY, C.—This is an action for damages for libel, and was commenced against appellant and Norman L. Nulsen, Albert G. Nulsen, Sr., and Albert G. Nulsen, Jr. At the close of plaintiff's case, the court gave a peremptory direction to the jury to find for defendant, Albert G. Nulsen, Jr., and plaintiff, as to this defendant, took an involuntary nonsuit with leave, but did not, so far as appears here, file motion to set aside the nonsuit. At the close of the whole case the jury found for defendant, Albert G. Nulsen, Sr., and against R. L. Polk & Company and Norman L. Nulsen, and assessed plaintiff's actual damages at $9000, but did not find punitive damages. R. L. Polk & Company and Norman L. Nulsen filed separate motions for new trial. Plaintiff filed motion for new trial as to defendant, Albert G. Nulsen, Sr. All these motions were overruled, and R. L. Polk

& Company and Norman L. Nulsen appealed. Norman L. Nulsen died March 22, 1939, subsequent to the appeal, and, on motion of plaintiff, the Nulsen appeal was abated March 6, 1940.

Error is assigned on the refusal of a demurrer to the evidence at the close of the whole case, on instructions, given and refused, and on the admission of evidence.

Unless otherwise noted, the term *defendant*, hereinafter, has reference to R. L. Polk & Company, appellant here.

Plaintiff is an attorney of St. Louis, prominent and of good repute, 47 years old at time of trial, June 6, 1938; is a member of the State Board of Law Examiners and has been since 1931; was chairman of the grievance committee of the St. Louis Bar Association for three years from 1932; was president of the association from May, 1935, to May, 1936, and while he was president, the association was the recipient of the St. Louis civic award for distinguished service.

In 1934, Norman L. Nulsen and his wife, Katherine Orr Nulsen, were divorced, and she obtained an alimony judgment for $20,000. He owned practically all the stock of the St. Louis Terminal Warehouse Company, and pledged this stock to his father, Albert G. Nulsen, Sr. The divorced wife brought suit to set aside this pledge, and on January 18, 1935, plaintiff was employed by Nulsen, Sr., to represent him in the suit to set aside. Nulsen, Sr., was entirely satisfied with plaintiff's services, but his son, Norman, who, the record tends to show, was of unsound mind, became obsessed of the notion that plaintiff had been unfaithful in his professional service, had "sold out," so to speak.

Defendant, whose main office is in Detroit, with branches in practically every large city in the United States, has for sale "mailing lists" for mail advertising and, as a part of the service, if a customer desires the defendant will address and stamp the envelopes and put therein the advertising matter furnished by the customer, and attend to the mailing.

Prior to August 19, 1936, Norman L. Nulsen had printed some 10,000 copies of the libelous *per se* circular that is the foundation of this cause, and prior to August 19, 1936, he secured from defendant some 10,000 names, with address, of business men, lawyers, newspapers, banks, manufacturers, judges, officers, etc. Most of these were in Missouri, but many were elsewhere. On August 19, 1936, Norman L. Nulsen delivered, or caused to be delivered, to defendant the printed copies of the libelous circular and for hire, defendant addressed the envelopes (furnished by Norman), placed the circular therein, stamped and mailed to these business men, etc., 9892 copies of the circular. The circular was phamphlet in form and contained four pages, each 8 by 11 inches. These pages contained the following:

First page: Somewhat towards the top and at the center is a picture of plaintiff. Over the picture and across the page in large

capital letters appears the words, "Thomas F. McDonald, former president of bar association, bar's cleanup leader." To the right of the picture: "Thomas F. McDonald faces criminal prosecution on extortion and murder charges." The words *extortion, murder, charges* were in large caps. Below the picture and in large caps and heavily underscored is "Exposed in extortion plot," and below and continuing to bottom of first page is the following:

"Thomas F. McDonald, former President of Bar Association of St. Louis exposed in extortion plot in collusion with Murray Edwards, attorney.

"Wealthy St. Louisan, retired manufacturer and business man demands immediate action by the Attorney General of the United States.

"Thomas F. McDonald is charged with conspiring and colluding with Murray Edwards, attorney, in an attempt to extort the stock of the St. Louis Terminal Warehouse Co., from its owners.

"He is further charged with obstructing justice, double crossing his client, deliberately giving misinformation, withholding important facts in a planned attempt to create a miscarriage of justice and to extort stock and other valuable property from Albert G. Nulsen, former president and owner of the National Pigments and Chemical Co."

Second page: Towards top and in center is a group picture of plaintiff, Frank Rand, chairman St. Louis civic award commission, and Mayor Dickmann. The picture was taken in the mayor's office and shows plaintiff, on behalf of the St. Louis Bar Association, receiving the city's civic award for distinguished service. Over the picture is, "Presentation of St. Louis Award." To the left: "Thomas F. McDonald recommends payment of blackmail to lawyer to prevent legal racket." To the right: "Posed as zealous reformer. Used prestige of office and publicity to cover his crimes." Below and near the picture and in small type is, "Thomas F. McDonald, chairman of the Grievance Committee of the St. Louis Bar Association, has been the leader in that group's activity for two years in bringing disbarment suits against lawyers found guilty of unethical practices."

Remainder of second page follows: "Thomas F. McDonald, widely publicized head of Bar Association, as a moral force in raising ethics and standards of the legal profession, faces investigation and prosecution for violating state and federal laws.

"McDonald is berated for posing as zealot in advancing legal ethics and standards while running rackets upon his own unsuspecting clients.

"While being paraded before the public as receiver of Award for Distinguished Service, McDonald was using this prestige to entrap, mislead and swindle unsuspecting clients."

Third page: Towards the top and at center is a picture of Nulsen, Sr., when a younger man. Over the picture is, "Reprinted from 'St. Louis, the Fourth City,'" which has reference to a publication in which the picture appears. To the left is, "Despoilers of St. Louis attempt to steal his property." To the right: "Helped to make St. Louis the fourth city." Under and near the picture is the name, "Albert G. Nulsen," and immediately below the name and extending across the page in large caps is, "Demands investigation by the attorney general." The page continues as follows:

"Albert G. Nulsen, active in business in St. Louis for over 35 years, headed 'The Nulsen Corporation' as president and principal owner. His paint business operated extensive Barytes Mines in Southeast Missouri and at Cartersville, Georgia. The companies' plants were located at St. Louis, Missouri, and Lynchburg, Virginia.

"A. G. Nulsen was known thruout the United States as the Barium King, because he operated the largest barium mines and refining plants in the United States. He later changed the corporation's name to "The National Pigments & Chemical Co., and sold his holdings to the National Lead Co."

. The contents of the fourth page is printed on a facsimile of the St. Louis Terminal Warehouse Company letterhead and, except as to what pertains to the letter, is as follows:

"August 20, 1936.

"Homer S. Cummings,
"Attorney General of the United States,
"Department of Justice,
"Washington, D. C.
"SUBJECT: Criminal Prosecution of Thomas F. McDonald on the *Principal Charges of Blackmail, Extortion and Murder.*

"The properly notarized and sworn affidavits of Albert G. Nulsen, Norman L. Nulsen, Jack C. Nulsen and Albert G. Nulsen, Jr., totalling 275 typewritten pages, have been forwarded to your offices at the Department of Justice, Washington, D. C. These documents cover the criminal activities of Thomas F. McDonald and others and develop the motives for the criminal acts.

"There are approximately 150 witnesses whose depositions and testimony will have to be taken to confirm, in detail, the long list of criminal activities of Thomas F. McDonald and the criminal acts of numerous others involved with him.

"The evidence and testimony, supported by the facts, will of course show that Henry Miller, President of the Terminal Railroad Association of St. Louis, is heavily involved, and I am confident that the depositions and testimony of the numerous witnesses will bring an indictment of Henry Miller from the grand jury.

"It has been suggested that you will find this case will call for a

special prosecutor since it covers a period of six years and involves men in high positions in the crimes of extortion and murder.

"Yours very truly,
"N. L. Nulsen

---

"Norman L. Nulsen."

There was no claim by any one at the trial that there was even a suspicion of wrongful conduct on the part of plaintiff concerning the litigation he handled for Nulsen, Sr. It is apparent that the whole of the contents of the circular sprang from a disordered mind and had no fact foundation whatever.

It is conceded that defendant had nothing to do with the preparation of the circular, and in such situation, defendant contends that it is not liable, unless its employees who attended to the addressing, enclosing, stamping and mailing of the circular *knew* that the circular was or probably might be libelous, and defendant says that there was no substantial evidence that defendant so knew. On the other hand, plaintiff says that defendant *published* the admittedly libelous *per se,* circular, and is, therefore, liable regardless of whether it knew that the circular was or might be libelous.

Defendant, in its brief, says that no "act on the part of the defendant . . . constituted a publication. . . . Publication is lacking . . . b'ecause the defendant was merely transmitting something which was apparently an innocent document without knowledge that it contained libelous matter." Corpus Juris defines publication, in the law of defamation, as "the communication of defamatory matter to a third person." [36 C. J., p. 1223, sec. 133. See also, Harbison v. Chicago, R. I. & P. Ry. Co., 327 Mo. 440, 37 S. W. (2d) 609, 1. c. 616.] There is no merit in the contention that defendant did not *publish* the libel. "The question as to what persons are liable for defamation is closely analogous to the question of what constitutes publication or who may be considered as publishers. . . . As a general rule, all persons who cause or participate in the publication of libelous or slanderous matter are responsible for such publication." [37 C. J., p. 12, sec. 298.] "Any false and defamatory publication which is not privileged gives rise to a case for damages sustained from it. This is true of libel. . . . The essential facts are the falsity of the charge, its publication and libelous nature." [Farley v. Evening Chronicle Pub. Co., 113 Mo. App. 216, 1. c. 227, 87 S. W. 565.]

Peck v. Tribune Company, 214 U. S. 185, 29 Sup. Ct. 554, 53 L. Ed. 960, 16 Ann. Cas. 1075, was for libel and was based on a liquor advertisement in a newspaper. In the opinion (by Justice HOLMES) it is said (214 U. S. 1. c. 189) : "There was some suggestion that the defendant published the portrait by mistake, and without knowledge that it was the plaintiff's portrait or was not what it purported to be.

But the fact, if it was one, was no excuse. If the publication was libelous the defendant took the risk. As was said of such matters by Lord Mansfield, 'Whatever a man publishes he publishes at his peril.' . . . The reason is plain. A libel is harmful on its face. If ·a man sees fit to publish manifestly hurtful statements concerning an individual, without other justification than exists for an advertisement or a piece of news, the usual principles of tort will make him liable, if the statements are false or are true only of some one else.''

Sorensen v. Wood et al., 123 Neb. 348, 243 N. W. 82, 82 A. L. R. 1098, was an action for damages against Wood, the radio speaker, and the KFAB Broadcasting Company. The plaintiff was a candidate for attorney general in Nebraska. Over the radio and of plaintiff, Wood, among other things, said or read from his speech: ''In his (the plaintiff's) acceptance of the attorney general's office he took an oath before God and man that he would uphold the law justly and honestly. His promises to man are for naught and his oath to God is. sacrilege, for he is a nonbeliever, an irreligious libertine, a mad man and a fool.''

The broadcasting company pleaded, among other defenses, that it .had no knowledge, in advance, as to the contents of Wood's speech, and among the instructions for this defendant was one telling the jury, in effect, that the law of negligence and not the law of defamation was the underlying basis for liability, as to the broadcasting company. The jury returned a verdict in favor of plaintiff and against Wood for nominal damages, but found for the broadcasting company. Plaintiff appealed, and the judgment was reversed and the cause remanded. The court ruled (headnote 2 by the court): ''When one writes libelous words concerning another and reads them before the microphone, with the consent of the owner of the broadcasting station and such owner broadcasts those words, the reader and owner unite in the publication of a libel.'' And further, the court said (243 N. W. 1. c. 86): ''It has often been held in newspaper publication, which is closely analogous to publication by radio, that due care and honest mistake do not relieve a publisher from: liability for libel. . . . The fundamental principles of the law involved in publication by a newspaper and by a radio station seem to be alike. There is no legal reason why one should be favored over another nor why a broadcasting ·station should be granted ·special favors as against one who may be a victim of a libelous publication.'' [See also, Miles v. Louis Wasmer, Inc., et al., 172 Wash. 466, 20 Pac. (2d) 847; Coffey v. Midland· Broadcasting Company, 8 Fed. Supp. 889.]

Defendant conducts, according to its general manager in St. Louis, a ''mail advertising business in St. Louis,'' and from the record it would appear that it conducts such business in all the large. cities of

the United States. Also, it would appear from the record that defendant has assembled and classified in catalogues the names and addresses of thousands if not millions of individuals, firms, etc., and these name lists are for sale, and, as stated, if the customer desires, defendant will address envelopes, enclose advertising matter, or whatever is to be mailed, and stamp and mail.

Defendant cites the libel case of Becker v. Brinkop et al., 230 Mo. App. 871, 78 S. W. (2d) 538. In that case separate demurrers to the petition were sustained, and plaintiff appealed. The petition alleged that plaintiff was a republican candidate for nomination for committee woman (13th ward) in St. Louis, at the August primary, 1932; Mrs. Rothweiler and Mrs. Engelmeier were also candidates for this place; that shortly before the primary defendants willfully, etc., distributed in the ward a circular that was libelous as to plaintiff. The petition contained a copy of the circular. One of the contentions made by defendants to support the court's action in sustaining the demurrer was that the circular was not libelous *per se*. Also, it was contended that publication was not alleged. The Court of Appeals held that the circular was libelous *per se;* that publication was sufficiently alleged, and reversed the order sustaining the demurrer and remanded the cause. In the course of the opinion, and relying on Odgers on Libel & Slander, the court said:

"To make defendants liable for the publication of the libelous circular, it must appear that defendants were aware that the circular was, or probably might be, libelous; also that they delivered it, or caused it to be delivered, to some third person, and that the third person read it, or saw it, and understood its contents. These elements must appear, for the reason that, if defendants could prove that they were wholly ignorant of the contents of the circular and had no reason to suppose that it contained libelous matter, they could not be held liable for it because it could not then be said that they had *consciously published* a libel" (italics ours).

It would seem that the court was of the opinion that the *consciously published* rule would be applicable in the Becker case, but plaintiff, in the present case, says that what is said or implied as to this rule being applicable in that case is *obiter.* Whatever the Becker case rules on the subject of *consciously published,* is not pertinent here, because such rule should not be applicable to such an *advertising agency* as defendant. In view of the fact that the circular here involved was clearly libelous *per se,* and in view of the service rendered by defendant, considered in connection with its extensive and far flung advertising facilities, we think that defendant's liability should be governed by the same rules of libel law applicable to a newspaper or a broadcasting company as ruled in the Sorensen case, supra. It is our conclusion that the court properly refused the demurrer to the evidence.

■ Error is assigned on plaintiff's instructions 1, 3, and 7, and on the refusal of defendant's offered instructions B, C, D, E, and F. Plaintiff's instruction No. 1 told the jury that if they found that the circular was libelous, and that defendant published it, then to find for plaintiff, even though they found "that the sending and mailing of said circulars by defendant . . . was the result of an oversight or mistake . . . without any intention or purpose to injure the plaintiff." Our ruling on the demurrer to the evidence disposes of the complaint on plaintiff's instruction No. 1.

■ Plaintiff's instruction No. 3 was on the measure of damages and told the jury that if they found for plaintiff they should award him actual damages in such sum "as you believe and find from the evidence will constitute a fair and reasonable compensation to him for such damages and loss as you find from the evidence he has sustained and will sustain as the direct and proximate result of the publication . . . of the circulars." The instruction then went on to tell the jury that in assessing actual damages they might consider:

"(1) The number of said circulars, the nature of the aforesaid statements contained therein, and the individuals, corporations and officials to whom said circulars were sent; (2) the damage, if any, to plaintiff's good name and reputation directly resulting from the publication of said statements; (3) the damage, if any, to plaintiff's practice as a lawyer directly resulting from said statements; and (4) whatever, if any, mental pain, anguish and humiliation the plaintiff has suffered and will suffer as a direct result of the publication of said statements."

Defendant says that plaintiff's instruction No. 3 "erroneously comments on the evidence and singles out and emphasizes certain evidence without requiring the jury to take into consideration all the other evidence in the case." As supporting this assignment, defendant cites Rice v. Jefferson City Bridge & Transit Co. (Mo.), 216 S. W. 746; Keppler v. Wells (Mo.), 238 S. W. 425; Burton v. Holman et al., 288 Mo. 70, 231 S. W. 630. There is nothing in either of these cases or any other that we have found from our own research to support defendant's assignment on plaintiff's instruction No. 3, hence we rule this assignment against defendant.

■ As stated, error is assigned on the refusal of defendant's instructions B, C, D, E, and F. Instruction B told the jury that defendant did not compose, write or print the circular, and that they should, therefore, find for defendant, if they found (1) that defendant was engaged in mail advertising; (2) that it was a part of its business to compile for its customers lists of names to whom the customer desired to mail printed matter and to address envelopes to the persons on these lists; (3) that defendant, at the request of Norman L. Nulsen, compiled for and furnished him the list of names; (4) that R. L. Nulsen furnished the circulars and directed defend-

ant to place them in envelopes and to send them through the United States postoffice to the persons whose names appeared upon said list; (5) that the circulars were mailed out in the ordinary course of the business carried on by defendant; and (6) that in receiving and executing the order of R. L. Nulsen, defendant "did not have any actual knowledge of the contents of said circulars, and had no reason to suppose that they were likely to contain libelous matter."

We think it is sufficient to say that our ruling on the demurrer to the evidence disposes of the assignment based on the refusal of instruction B.

Instruction C is, in effect, a repetition of the 6th hypothesis in Instruction B. Instructions D and E were to the effect (D) that there was no evidence tending to show that defendant had any knowledge of the contents of the circular, and. (E) that there was no evidence tending to show that defendant had knowledge of any facts or circumstances which would cause belief "that said circular was likely to contain libelous matter." Our ruling on the demurrer also disposes of the assignment on the refusal of instructions C, D, and E.

Defendant's assignment on the refusal of its offered instruction F, and on the admission of evidence are so related that they may be considered together. Frederick Stroup, a high school boy, employed by defendant as errand boy, actually trucked the circulars to the postoffice. Over objection and exception, Frederick, as a witness for plaintiff, testified that while about defendant's office he "saw the girls addressing the envelopes," and later putting the "circulars in the envelopes," and that he read "all of the first page" of the circular. Defendant contends that Frederick was not such agent or employee as to bind defendant on the question of knowledge of contents, and instruction F was to the effect that knowledge on the part of Frederick as to the contents of the circular would not be binding on defendant.

The ruling on the demurrer also disposes of the assignments on the refusal of instruction F and on the admission of evidence. The judgment should be affirmed and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by Bradley, C., is adopted as the opinion of the court. All the judges concur.